## ALICE WEIGEL

*v.*

## PHILIP WEIGEL.

[Filed September 24th, 1900.]

1. The burden of proof of a charge of violent sexual abuse rests upon the complainant who alleges it.

2. Her uncorroborated testimony cannot carry the burden.

3. Where the testimony of a wife as to matters known to other and dis-interested witnesses is by them shown to be false, it is discredited when addressed to the narration of the privacies of her married life.

4. A decree for divorce *a mensa et thoro* will only be granted where it is affirmatively shown that there is such extreme cruelty as threatens to endanger the future health or life of the complainant.

---

On bill for divorce *a mensa et thoro,* &c. Answer and proofs.

The marriage of the parties took place in 1880, at New Brunswick, in this state, where they have ever since resided.

The bill is framed upon allegations that the defendant husband has always shown towards the complainant a miserly disposition, prohibiting her from all social enjoyment and even from necessary household expenditure, treating her with continuing violence and cruelty. It alleges that in 1889, she was obliged to leave him "owing to his cruel treatment." Wherein this cruelty consisted is not stated. The bill further alleges that she returned after six weeks, on promise of better treatment, and remained until July, 1897, when she again fled from her

Weigel *v.* Weigel.

home, with her three youngest children. That ever since her return to her husband it has been his constant habit to curse her with vile epithets, and to accuse her of adultery and prostitution, and to deny their children's paternity, all in their presence, and also to strangers; to smash dishes and make murderous threats; to refuse properly to clothe her and their children; to threaten to put her in an insane asylum; to keep visitors from calling on her; to declare he intended to drive her crazy; to speak fondly to complainant of his typewriter; to prohibit complainant's family from visiting her; to conduct himself brutally and indecently before their children. It is especially charged that he deprived complainant of proper food, and by forcing her to submit to "his unbridled sexual ferocity, caused her to suffer seven miscarriages," and almost killed her, completely destroying her health and shattering her nerves, so that at times her mind wanders, and she is in danger of becoming permanently deranged, unless relieved of such a life; that the sheerest necessity has compelled her to leave her husband, which she did, as stated, on July 17th, 1897.

Although the bill as originally drawn stated no other cause for divorce than those above quoted, it prayed that the marriage might be dissolved, and that the complainant might have the custody of her children.

The defendant has answered the bill, denying in detail each and all of the accusatory allegations of the bill, alleging that the wife has secretly and without reason left his house, taking three of his children, and articles of furniture and clothing; that his wife's family and particularly her sister, Mary J. Welch, have interfered in the parties' family affairs, and made trouble by secretly influencing the complainant to be hostile to the defendant, and finally to leave his home, which he declares ever has been and is now open for her return. He alleges that he has spent an average of $3,300 per year for household purposes alone; that his wife purchased goods in defendant's name, and gave the goods and sometimes defendant's money to her relatives; that his wife, at the instance of her family and particularly of Miss Welch, demanded that a separate money provision should be made for her; that the object of the complain-

ant's suit is to compel such separate maintenance in order that her family may thereby be benefited.

. The cause had proceeded to hearing on the bill and answer, as above stated, no question having been raised regarding the sufficiency of the allegations of the bill to support the prayer for an absolute divorce. The evidence on both sides was addressed to the proof of a right to a divorce from bed and board because of alleged cruelty, &c., of the defendant, or to its refutation. While the hearing of the cause was proceeding, the prayer of the bill was amended by consent of parties, by striking out the request for a decree for dissolution of the marriage and inserting instead a prayer for divorce from bed and board because of cruelty, &c.

The cause has come to argument on the pleadings so amended, and the testimony taken at great length.

*Mr. Francis D. Weaver* and *Mr. John W. Wescott,* for the complainant.

*Mr. Abraham V. Schenck,* for the defendant.

GREY, V. C.

This cause has been presented by the most elaborate and searching proof of all the details of the married life of the parties. The frame of the bill of complaint claims the existence of certain special facts of cruel treatment by physical violence, and also contains charges of lesser acts of brutality, resulting in danger to the complainant's health, and even to her reason, and alleges her departure from her husband's home as a consequence. The defendant's denial is full and complete as to each and every allegation of misconduct made against him.

The complainant states a case on which she asks relief. The burden of proof is upon her to show the existence of the facts necessary to sustain a decree. The rule is the same when the bill is filed for divorce because of extreme cruelty on the part of the husband. *Fischer* v. *Fischer, 3 C. E. Gr. 300.* The most serious charge, the only one specifically set forth in the bill, which is of itself indicative of such cruel treatment as would

support a decree, is that the defendant violently and against the complainant's will, while she was sick and enfeebled, forcibly compelled her to submit to sexual intercourse, and that this conduct was so frequent and continued that it had caused the complainant to have a number of miscarriages, and had undermined her health and endangered her reason.

Such a course of misconduct on the part of a husband, if supported by evidence which raises a reasonable apprehension that further acts of the same abuse will be committed if the wife should return to him, would constitute the extreme cruelty contemplated by the statute. *English* v. *English, 12 C. E. Gr. 585* (*Court of Appeals*).

The testimony in support of this allegation is that of the complainant herself. The defendant explicitly denies the alleged forcible assertions of his marital privileges, and also that the miscarriages claimed by the complainant are attributable to any such cause.

In such a clashing of the proofs there must be evidence either direct or circumstantial to sustain the complainant's charges, or they fail of proof. The complainant submits none which corroborate her own narrative.

The only attempt to support this charge by the testimony of other persons is offered by Miss Mary Welch, the sister of the complainant. This relates to an alleged attack in the early morning some time in 1891 or 1892, at least five years before the filing of the bill. Miss Welch does not say she was present when the incident began, nor does she state anything which gives to the matter the coloring with which the complainant paints it.

All Miss Welch testifies is that the complainant declared that the defendant would kill her; that she (Miss Welch) went down to their room, and the defendant, when she went in, began to swear about a clock. The testimony of Miss Welch is in no way corroborative to show violent sexual abuse or to define in what way the complainant claimed that the defendant would kill her. The whole incident is denied by the defendant.

This failure to carry the burden of proof would of itself remove this alleged cause from further consideration. But even if the wife's story were uncontradicted, it could not alone sup-

CASES IN CHANCERY.

port a decree for divorce. The essential facts entitling the complainant to a divorce cannot rest solely upon the testimony of the complainant. *Tate* v. *Tate, 11 C. E. Gr. 56,* in this court, and cases there cited, and *McShane* v. *McShane, 18 Stew. Eq. 341 (Court of Appeals).*

It is difficult, of course, to make affirmative proof of such a charge, because of the privacy which decency imposes upon such incidents, but it must be remembered that all the wrongfulness attributable to such misconduct is a matter of degree, and that proof that there was no excess which may be the sole defence is even more difficult. It is, however, but just to say that such evidence as throws any light on this point, tends to show that the accusation made against the defendant husband is false, and also to account for the miscarriages in a way which imputes no blame to the husband, but which need not be here discussed. The complainant testifies that her doctor attended her for all of the miscarriages save one. He was called as a witness by the defendant, and his testimony taken by special deposition. It tended rather to contradict than to confirm the complainant's accusations against the defendant.

The letters written by the complainant between September, 1891, and August, 1895, at about the period when some of the miscarriages occurred, indicate that the charge of habitual sexual violence is untrue.

The letters speak without the strain attendant upon this litigation, and show that the relations between the husband and wife were most kindly. They are expressed in terms which indicate a confidant certainty on the part of the wife that the husband understands and affectionately appreciates her, and that she is happy in that belief. It is very difficult, if not impossible, to reconcile the tone of these letters with the present testimony of the wife as to the habitually violent conduct of the husband, and her sufferings consequent thereon.

The only other charge of actual physical violence is the claim that the husband, wholly without cause, struck the wife in the face when she asked him to be careful in moving a chair. This incident does not appear in the bill, but is narrated by the wife in her testimony. The blow is claimed by her to have been given

Weigel *v.* Weigel.

without any previous conversation or quarrel. As it is the only blow claimed to have been struck during the whole of their married life, the story as told is somewhat incredible. It is denied by the husband, and is entirely uncorroborated. It is within the rule above quoted, that an incident essential to support a decree for divorce must not depend wholly on the testimony of a complainant.

The residue of the charges may be classed together as exhibitions of the infelicities of married life, no one of which would of itself justify a decree on the ground of extreme cruelty, but which might (if all were proven) show such cruel conduct on the part of the husband to a wife, whose ill health had reduced her vitality and lessened her nervous power, that for the future protection of her life or health, a decree for divorce *a mensa et thoro* might be necessary.

All of these charges are denied by the husband, and almost all of them are specifically refuted by the proofs. The complainant, in her testimony, attempts to support all of them. The refutation as to some of them is so broad and clear as to throw doubts upon the veracity of the complainant, when she is testifying upon those more private matters which could be known only to the defendant and herself.

It should be noted that the bill charges that habitually from 1889 to 1897 the defendant cruelly dealt with the complainant in the manner recited in the bill, until her health was undermined. The allegations of the use of foul language and vile epithets has but little weight as an element of cruel treatment, when the complainant is forced to admit that she herself openly accused her husband of unfaithfulness, a charge which is fully refuted in the proofs. The testimony of some of the servants also shows that she frequently used such language as precludes a belief that the hearing of that charged against the husband, if it was ever spoken by him, could have seriously affected her health.

The allegation that the defendant refused properly to clothe the complainant and his family, and that he deprived them of proper food, is entirely overthrown by proof that the complainant herself during almost all of their entire married life bought the supplies for the household of such kind and quantity as she

deemed fit; that the only restraint put on her by her husband was occasioned by his belief that she was using his money for the benefit of Miss Welch, and then his interference did not prevent the getting of supplies for the family, but only the misuse of his money. The wife herself then, during the last six months of her stay at her husband's home, refused to buy for the household, and it was done by the defendant or by the servants, and without any limitation of quality or quantity. Storekeepers and family servants in great number exhibit this condition of affairs.

The charges of deprivation of help in the family, and the forcing the complainant to hard labor when in ill health, the denial of nurses when she was sick, are all refuted by the production as witnesses of the many servants and nurses, most of whom were both employed and discharged by the complainant herself.

The alleged prohibition of the complainant's family from visiting the home is also shown to be false, the complainant's own testimony showing visits from her mother and her sister, and her letters also show that she visited her own family. Miss Welch was, it is true, at the later period of the married life, forbidden the house by the defendant. He admits it and justifies it. It cannot be said, even if he were mistaken in issuing this prohibition, that his exclusion of Miss Welch from the house is an incident of much weight in showing extreme cruelty to the complainant. The head of the house certainly had a right, within reasonable bounds, to prescribe who might be admitted to his household. He believed he had good grounds to forbid Miss Welch's presence, and his forbiddance, especially as it was fruitless to exclude Miss Welch, cannot be held to have been an element of cruel treatment of his wife.

The sum of all the allegations of cruel treatment is that the complainant was driven by it to such a condition of broken health and shattered nerves that her reason was threatened and she was compelled to leave her husband's house in July, 1897. This is circumstantially and flatly contradicted by the defendant. Such a condition of health would most probably be apparent to those with whom the complainant came into personal

association in her daily purchases. These persons, who had known her for years, and also the servants in the house, agree that she showed at this time all the indications of robust health. Evidence of such a loss of health might readily have been strongly supported by the testimony of the physician, who the complainant swore her father called in when she arrived at his home in July, 1897, her health so run down that she could not stand the life her husband had imposed upon her any longer. The complainant gave the name of this physician, but she did not call him as a witness.

The children of this unhappy pair have been brought into court as witnesses in support of their mother's claims that her husband used her cruelly. The demeanor of the children when on the stand, and the uncertain and varying character of their testimony strongly indicate that they are influenced, as naturally they might be, by their greater affection for their mother, to color their testimony to favor her claims. If all they stated was true, it does not exhibit a case for a decree for divorce because of the extreme cruelty of the defendant.

The trend of all the testimony on both sides shows that the real difficulties between the parties which led the complainant to leave her home, were not those set forth and made the subject of complaint in the bill.

The defendant was a merchant, absorbed in his business, and desirous that his household should be managed and conducted with economy. The proof shows that he was fond of his wife, so far as she would permit, and of his children, and that far from depriving either her or them of the necessaries of life, he provided for them according to his station in life, by allowing his wife to purchase at her will, at various shops, supplies of all kinds for their home. That from an early period in their married life, the husband had (whether with or without reason, is, in my judgment, of little consequence) disliked the presence of Miss Mary Welch, his wife's sister, in his home, and had several times requested his wife not to have her there, and had finally told his wife not to receive Miss Welch, and had forbidden the latter to come to his home. This direction of the husband neither the wife nor Miss Welch ever accepted in a spirit of

obedience. Miss Welch came to the house surreptitiously, and was received by the wife in defiance of her husband's prohibition. Out of this line of conduct grew the charges of the husband that his money was used for the benefit of Miss Welch, and other members of his wife's family, and the refusal of his wife to make purchases for the household if she were obliged to account for the money she spent. The substantial basis of all the quarrels during the year previous to the wife's leaving the house is traceable to this defiant determination of the wife to accept the guidance and control of her sister rather than of her husband. This condition of affairs reached its climax in the early part of 1897, when the complainant denied the defendant access to her room, and refused longer to purchase the supplies for the household. The incident of the anonymous letter sent to the defendant in May, 1897, denouncing and threatening him for his treatment of his wife, the charge that Miss Welch sent it, her arrest, the quarrels about the defendant's typewriter, and the false accusation against him of adultery, all happened during the spring and early summer of 1897. The complainant left the defendant's house in July, 1897, of her own accord, without the knowledge of her husband. All these incidents of dissension happened very shortly before the complainant left her husband's house, and were undoubtedly the provoking cause of her leaving.

The complainant's counsel urged with much energy that in leaving her husband's house the complainant sacrificed all the comforts of life, and that there must have been some tremendous motive which induced her to give up all the attractions of her husband's home and to flee to the comparative poverty of her father's house. He insists that it must therefore be believed that her account of the reasons for her flight is true, that it can be explained in no other way.

The burden of proof as to the happening of specifically narrated events can hardly be carried to such a conclusive result by mere presumption; especially when the wife's testimony upon which the inference depends is woefully discredited at almost all points where it is met by that of disinterested witnesses. It must also be noted that the alleged causes set forth in the bill are narrated by the testimony of the wife to have happened

many years before the separation, the wife meantime living, as her letters show, happily in her married life, while the incidents attending the quarrels about Miss Welch very shortly preceded the separation.

Running through the proofs are many indications that the wife was actuated by a belief that she was free to leave her husband, if she chose, and that she could yet compel him to divide his means with her or separately support her. Such a belief on her part, when she had lost her affection for her husband, would readily account for her apparent sacrifice of material comforts.

The cases in this state declare that the remedy by decree of divorce for extreme cruelty is applicable not as a punitive, but as a preventive measure, to protect the health or life of the wife in the future from threatened danger. *Burton* v. *Burton, 7 Dick. Ch. Rep. 219; English* v. *English, ubi supra.* In this case there is no condition of threatened danger. The proof shows that the wife left her home of her own free will, without just cause, and that she may now return to it and that she will be there received by her husband.

The bill of complaint should be dismissed.

The question of custody of children, raised by the bill of complaint, is dependent upon the granting of the prayer for divorce and must fall with it.